Good morning, Your Honor. It's a pleasure and an honor to be before the Honorable Court this morning. Thank you very much. If it pleases the Court, my name is Stephen Volcker. I represent the Conservation Coalition Appellants. We seek review of two rulings by the District Court. One, that the Water Resources Development Act of 2007 be approved by the District Court. Section 2733 U.S.C. Section 2283D did not require the defendant Corps of Engineers to prepare a specific mitigation plan before approving its Mississippi River Regulating Works Project. And two, that the Corps' supplemental EIS for the project was adequate. Sections 2283D1 and D3 require specific mitigation plans with many specified components for damages to ecological resources, including terrestrial and aquatic resources and fish and wildlife losses resulting from federal water resources projects. For 2007, mitigation plans were required only for one category, the submission of any proposal for the authorization of any water resources control project to the Congress in any report. In 2007, Congress added, quote, and the secretary shall not select a project alternative in any report. The word and, I should point out, is additive. Because here the Corps issued a report which selects a project alternative, the supplemental EIS, which selects the project, and the project will have greater than negligible adverse impact on ecological resources, the Corps was required to include a specific plan to mitigate for damages to ecological resources created by such project. Mr. Polker? Yes. Can I ask you, you've got an interesting puzzle for the, for statutory interpreters here, given arguments, material for both sides. Let me start with a hypothetical. Suppose what we were talking about was a record of decision that was, that used an environmental assessment and a finding of no significant impact on the environment. Would such a, quote, report have to include the detailed mitigation plan that you're arguing would have been required here? Perhaps not, because the key here is whether there will be more than negligible adverse impacts on the environment. And typically with an environmental assessment finding there's no need for an EIS, there's a finding that there is no significant or potentially significant environmental impact. So by and large, environmental assessments would not trigger the requirement. I could easily imagine, however, somebody opposing a project arguing that those are two different phrases for no significant impact. And what's the one here for under 2283, the minimal, no more than minimal? Negligible, yes. Those are different standards and so there's room to split the difference and that you'd have to be, have a mitigation plan for an environmental assessment. Well, I agree with the court that in the event that the statutory standard were satisfied, yes, a mitigation plan would be required to provide for avoidance, minimization, and compensatory mitigation for impacts that the environmental assessment identified as falling within the statutory standard under 2283 D1. So we cannot overlook the direction by Congress here, which was pretty broad. As the court is aware, the rule of statutory construction is that when a statute has been amended, which is unusual when it's of this scope, the presumption is that Congress intended a change in the law. So what do we make of the, if the Senate bill had been adopted, you probably wouldn't, right? Which that language specifically referred to requiring mitigation plans for environmental impact statements and environmental assessments and so on. But the conference committee backed off of that language. What do we, what significance does that have for us in interpreting this phrase? The significance is insofar as one is, first of all, compelled to implement the plain language of the statute, then the plain language governs. It's not plain. I mean, let's start with that. Okay. I understand your position, but I don't think it's plain on this point. So given the history of the Senate language being changed in the conference report to something different, what do we make of that? Well, the conference report, as we indicated in our brief, confirmed the expansion of the mitigation mandate. It stated the increased mitigation requirements apply to all new studies and any other project that must be evaluated for any reason. So that reflects the approval of... Evaluated for whom? For the general public? For internal staff reports? What's the scope of that? My understanding would be that as in the case of any public document, the public has access to it. And here where there was a supplemental EIS, clearly the public had an interest in reviewing the document and the Corps had a reciprocal obligation to assure that that interest was addressed fully. That did not happen here, Your Honor. Well, I think you may have missed the point of my question, which was the question is, in essence, do those... Why do those kinds of reports and even internal reports, presumably under your broad reading of the language of the statute, have to include that mitigation plan rather than just mitigation reports going to Congress, which has to do all these kinds of project evaluations itself? Well, in this case, the supplemental EIS was circulated to thousands of members of the public and agencies and prompted hundreds of responses from agencies and the public. So clearly, we're talking about a document of some moment that was in the public realm and accordingly, the need to attend to the mitigation plan requirement that had been changed in 2007 is uppermost. That's the first order of business, both under WERDA 2007 and under NEPA, is that where there is the potential to mitigate an environmental harm, that the agency has an obligation to examine alternatives or mitigation measures that would provide a pathway to mitigate that harm and still achieve the objectives of the project. The goal is a win-win to provide that needless harm to the environment avoided. Right. Now, the Corps has been interpreting this language since 2007 as applying only to reports to Congress, right? That would be incorrect, with all respect, Your Honor. May I elaborate? Please. Yes, okay. On pages 27 to 28 of our appellant's opening brief, we listed four implementing regulations for water resources projects that use the term reports to describe documents not submitted to Congress. That would be at 33 CFR Sections 209.140, 230.15, 385.12, and 385.26. I understand the regs and the statutes are not consistent in the way they use term reports. Sometimes they're more precise, sometimes they're less. But with respect to the mitigation requirement in 2283D, I understood the Corps' memo from 2007 to be saying this applies to reports to Congress. Am I misunderstanding that? Yes, the implementing regulation was amended by the Corps of Engineers to basically back-engineer its misinterpretation. I understand you're unhappy about it. Did they interpret it that way in 2007? I believe that it was subsequent to 2007, Your Honor, but at some point... They adopted a regulation which provided a basis for maintaining that position, yes. Yes, okay. That's about 15 years ago. Has there been any pushback from Congress to say, no, you misunderstood this? Committees that are responsible for these kinds of things have pretty close communications with agencies like the Corps. Do you have any indications that others have been unhappy with this? Personally, I'm not abreast on matters of that nature, but my client, the National Wildlife Federation, Lee client, is aware that there has been a lot of activity in Congress reflecting a concern about this. Mr. Volker, let me ask you a different question about the statutory scheme here. Can you cite any provision in the 2007 Water Resource Development Act where Congress used this term report? They used it in a way to include an environmental impact statement, but they didn't say that's what they were doing. And the reason I'm asking you that question is because when I look at the public law document and I look at amendments, for example, to Section 2346 in Title 33, amendments to 2215A, when Congress uses the term report in the text of the statute, they are very clear to say that by that use of the word report, we are including environmental impact statements, but they do not do that in 2283D3. So shouldn't the court take some direction from that statutory structure, the way Congress is using the report in some areas of the statute, but not others? Actually, I would construe it exactly the opposite from the interpretation that Your Honor has suggested, and the reasons are twofold. Number one, Congress used the term any before the word report. The word any means every. It's the broadest possible formulation in the English language to comprehend all types of reports. It didn't say reports that are included in proposals for authorization to Congress. That would have been the perfect way to achieve the objective had Congress had in mind that the clause added in 2007 was limited to proposals to Congress for authorization. I understand that's your argument, but I didn't hear an answer to Judge Scudder's question. There are four places in the statutes, in the word is that... No, what? Water Resource Development Act. Okay, I got it. Go ahead. Keep going. There are four places at least, and there are probably others. We did not do a comprehensive survey just sufficient to make clear that Congress was not routinely adopting a narrow construction of the term report. In 33 U.S.C. 2282b-5, Congress included within the term, quote, report, close quote, a report to a non-federal interest. So clearly, that's not a report to Congress. It's not a report that's part of a proposal for authorization. In section 2282a-4, Congress included the term environmental impact statement in its definition of feasibility report. That suggests that there was no uniform restriction of the term report to exclude environmental impact statements. In section 2282c, Congress used the term report to describe project-related studies not sent to Congress for authorization because they are implemented through one of the Corps' continuing authorities programs. So with a little understanding of how this works, there are matters that are within continuing authorizations that are not submitted to Congress. And this is an example where Congress used the term report with the understanding that report was not restricted to proposals to Congress for authorization. Then also in section 2346, which the court mentioned, that expressly includes the term environmental impact statement among the documents within its heading, report repository. So those are four of perhaps many examples where the term report was not used by Congress, and it certainly wasn't used by the Corps of Engineers in its implementing regulations to restrict the term to proposals for authorization to Congress. Mr. Volker, do you want to reserve some time for rebuttal? Can I just ask one much broader question, Mr. Volker? And that is, in essence, what do the plaintiffs want in this case? What do you want the Corps to do with this stretch of the Mississippi River rather than just keep it open for barge traffic? Well, obviously, we support the use of this critical part of the nation's commercial waterways to protect commerce. No doubt about that. We are fervent supporters of that. However, we're trying to achieve what we believe is Congress's intent to assure that the good efforts of the Corps of Engineers to maintain that navigability also embrace Congress's direction that there be mitigation, that is, avoidance, minimization, and compensatory mitigation where it's possible. And the best way to do that is to adhere to Congress's direction in 2283 D-1 and D-3 to prepare the mitigation plan required. And as the court is aware, D-3 requires six specific components. What do you want them to do? To do the plan. No, no, no. What do you think, what do you want that plan to provide for in terms of physical alterations to the river? We wouldn't presume to know what physical alterations are required. That would be beyond our plan. That's for the engineers and the coalitions. I just thought that's what you might say, and the difficulty that I have with that is how you align that position with Congress expressly authorizing a programmatic approach to mitigation. In other words, looking at mitigation more in installments, not with respect to the whole 195-mile stretch. And that is expressly in the statute in 2283 H. In other words, it seems to me that your objection is much more with Congress than it is the court. Well, we're trying to follow the direction of Congress by looking at its language. And the language in 2283 D-3 identifies six. I know that. But when Judge Hamilton says, what are you getting at? And you say we want a mitigation plan. Yes. Congress has said we allow the court to do this in plans, plural, mini plans, as part of a programmatic approach to take segments or installments of the middle Mississippi River. And then really, really focus on the environmental aspect of what's going on in that segment, vis-a-vis a construction proposal or dredging or anything else. Well, the short answer would be the programmatic reference in subsection H does not amend or exempt the requirement in. No, but of course, you need to read it as a whole. You need to read the statute as a whole. I mean, you don't think we're not going to we're not inclined to read H. The very same Congress that put H there put a put D there. I think they're not going to work at cross purposes with one another. They're going to work in harmony with one another. Well, may I respond?  Two points, Your Honor. First of all, neither the notice of the draft EIS or the notice of the final EIS or the titles of those documents use the term programmatic. So as a technical matter, although they had language about the broad scope of the assessment, they were not technically speaking programmatic EISs. Secondly, I agree with the court that one has to look at D3 and H together as is required whenever one's examining a statute. And I believe they can be harmonized because D3, the requirements in D3 to provide for identification of ways, whether it's on a programmatic basis or a site specific basis of identifying less impactful measures. The overall context, if I could just take a step back, is that we have in the last 30 years, I think there are 48 independent scholarly works that concluded that the regulating works program was having a deleterious impact on fish and wildlife. And that there was a need to take a look at ways to modify the project. And of course, we have statutes, the 1990 WERDA, the 2007 WERDA, the 2014 WERDA, the Fish and Wildlife Coordination Act, and we cite sections from all those that make clear that Congress was concerned about the loss of ecological health in the middle Mississippi River and was adopting programs directing the Corps of Engineers to look at mitigation. But isn't there a cost sharing requirement? The cost sharing requirement, I think, has been the source of some confusion, but it's unjustified. The governing statute is in 33 U.S.C. 2283C, which refers to fish and wildlife mitigation and allocation of mitigation costs. It says costs incurred after November 17, 1986 shall be allocated among authorized project purposes in accordance with applicable cost allocation procedures and shall be subjected to cost sharing or reimbursement to the same extent as other programs. This project is a 100% federally funded, federally mandated program. The Regulating Works Project being 100% federally funded, the mitigations of its impacts are also 100% federally funded. There is no local partner sharing in the cost. This does not involve any contribution by anyone else, and that's never been a requirement, and the Corps is implementing regulations to confirm that in the planning guidance notebook, which is ER 1105-2-100. Mr. Volker, let's do this. Let's move to the Corps. No, no. No need to apologize. We'll give you a couple minutes for rebuttal.  Thank you, Your Honor. You're welcome. Collier, good morning. Good morning, Your Honors, and may it please the Court. Amy Collier on behalf of the federal defendants. I think it would be helpful at the outset to provide a little context about what the Corps is doing on the Middle Mississippi. So Congress has long recognized both the importance of a navigation channel on the stretch of the river. Your Honor, can we jump to 2283? Yes. Yes. And so I think, as the District Court found, the District Court focused on 2283-D, but I think it's also important to look at 2283-A and Subsection B. So Subsection A provides that the Corps must mitigate. Was the argument of Subsection B raised in the lower court? It was not directly raised in the lower court. It was raised throughout the SEIS, and I think it just provides context for why Subsection D is not applicable. I would also note that in plaintiff's appellant's opening brief on page 16, they mentioned that the Corps was authorized in the 1986 WERDA to engage in mitigation, and that sort of comes from Subsection B. So Subsection A, again, says that the Corps must mitigate for projects where construction has not commenced as of 1986. Subsection B then provides the Corps with discretion to mitigate for projects, whether under construction or not. It's not the argument that this is a 2017 project, so therefore it couldn't have started before 1986. So I think it's important to keep in mind the term water resources development project. Only Congress can authorize a water resources development project, and Congress did so for the Middle Mississippi in 1910 and modified it in 1927. And you can see, for example, in the language in the 1927 Act, Congress referred to it as the existing project. In 2014, in that Water Resources Development Act, Congress referred to it as the project for navigation. So again, Congress is treating the whole Regulating Works project as a project. What the 2017 SEIS, Supplemental Environmental Impact Statement, did was the Corps saw, you know, there's new information about the impacts that this larger project is having. And so we're going to step back, we're going to study those impacts and determine whether to continue with construction, that is one of the alternatives, or whether to stop all construction. And so the position is that the Subsection B's discretionary provision applies. And consistent with that discretion, the Corps did prepare a mitigation plan, one that's consistent with a programmatic analysis for this 2283-H. So the Corps did not prepare the mitigation plan pursuant to subsection H because the Corps had not yet prepared implementing guidance for that subsection when it was working on the SEIS. Our position though is that, you know, the existence of subsection H, which was added in the 2014 WERDA, is showing that Congress does have a different sort of understanding for how this is supposed to apply to programmatic studies. And so the Corps' position is that it will prepare tiered environmental assessments off of this SEIS. In fact, it has already done so. And those will contain detailed mitigation plans that will, you know, look at the structures that are being proposed, use the Corps' newly developed border habitat model to sort of assess what those impacts will be, and then craft a mitigation plan that will directly address those concerns. Ms. Collier, is that a way of saying that the Corps is approaching this from a mitigation perspective pursuant to and within the confines of H from here forward? I think that's a fair representation. I wouldn't say directly that the Corps is engaging with everything in H because, again, I think mitigation still remains discretionary for this project under subsection B. But the Corps has committed in the continuing construction alternative to engage in mitigation to the greatest extent practical going forward, and has plans, as it has already done so, to prepare mitigation plans when construction is actually proposed at the site-specific level. And I think it's helpful, again, to look at subsection D in the context of subsection B. Again, subsection B provides that discretion. It would be a little illogical for Congress to mandate the preparation of a specific mitigation plan for a project where mitigation is, in fact, discretionary. And so, again, our position is that it applies to both proposals for new projects under the first clause, and then also for any reports seeking a reevaluation of a project. I'm sorry. Do we agree, though, when we're looking at the 2283D language, that under both categories that you just described, that it would have to be submitted to Congress? I think in the context of this statute, yes, that was Congress's intent, that it would be something submitted to Congress. So when Congress is deciding whether to authorize a new project or to modify an existing project, it has all the information in front of it, including the plan for how the Corps is going to mitigate those impacts. And I think it's also important to look, again, at the specific language. Appellants focus on the word any, but, of course, the language also uses the term report. And as your honors have pointed out throughout the 2007 WERDA and subsequent WERDAs, Congress has specified the use of environmental impact statement or record of decision in places where it wanted report to include that term. And to go to Judge Hamilton's questions for appellant, so the Corps' implementation guidance was issued in 2009. Since then, Congress has passed five additional WERDAs, including at least a few since the 2007 SEIS was issued, and Congress has not amended 2283D to expand it in any way. Can I ask you, Ms. Collier, to, I want to focus on the statutory phrase about selecting a project alternative. In what documents does the Corps select a project alternative? Certainly. So the Corps refers to selecting alternatives, for example, in feasibility reports. So that's 33 U.S.C. 2282. Now, that is one that includes report EIS. It includes associated environmental impact statements, but it also explains that it includes, the feasibility report shall describe, and then it says, and in a recommended plan and alternative plans considered by the secretary. I would say in places where it lists out environmental impact statement, it never says that an environmental impact statement on its own constitutes a report. So one prepared, you know, for continuing construction that's not submitted alongside any report to Congress. It never says that that alone constitutes a report. It's just in the context of some sort of other proposal. Or, for example, so re-evaluations of project, if the Corps is going to go back to Congress and suggest that there's some re-evaluation of existing project to modify it, it'll present alternatives. Okay, but let me re-ask my question. In what documents does the Corps, quote, select a project alternative? Well, I would say, so I would say in feasibility reports and proposals to Congress in that sense, the environmental impact statement does not select a project alternative. It selects a preferred alternative or identifies a preferred alternative, but it is really an environmental analysis of the impacts of a project. Not a decision. Not the environmental impact statement. What about the ROD, Record of Decision? Again, the preferred alternative as the continuing construction alternative. But it is, the Corps does not treat that as a report that selects an alternative. It's a record of the decision for how the Corps is going to proceed. And I think it's important, again, to look at this document as a supplemental environmental impact statement. The Corps was at a point in the construction of a project, and it was deciding whether or not to continue with construction of the project, or to stop all new construction and maintain the channel through the existing structures and dredging. So, it's a somewhat fine line there. But again, it's a record of decision for the Corps identifying the preferred alternative. That is a fine line. So, I would just add again that, you know, the Corps has, you know, been in dialogue with Congress about this project for 100 years. It is an ongoing project. Congress recognizes the challenge of maintaining this channel. It has authorized the Corps to maintain a channel of specific dimensions, again, using river training structures to reduce dredging. Since the 2007 WERDA, Congress has funded, continued to fund construction. Congress has not modified the purpose of this project to prioritize environmental protection. Nevertheless, the Corps has continued to work with other agencies to develop innovative structures, to implement those innovative structures, to reduce impacts to the environment. Can I go back into the weeds of 2283D and the 2007 amendment? I'd like you to try to explain to me what you think the effect of the final conference language was, how it changed pre-existing law. From the Senate version or the language? From the 2006, the earlier version of the law, which referred only to in any report. Yes. So, actually, I would like to make one point of clarification. So, before 2007, Section 2283D said that the Secretary shall not submit any proposal for the authorization of any water resources project to the Congress unless such report contains. It didn't have the in any report. So, in 2007, then again, so that was specifically clearly for proposals of water resources development projects. And my question in essence is, what do you think 2000 amendment, 2007 amendment changed? So, what the 2000 amendment changed was to broaden it to not just proposals for new water resources development projects, but for other sorts of re-evaluations of existing projects. So, for example, that's why the language cited by appellant says, or projects that must be re-evaluated for any reason. Re-evaluation is a term that's used in WERDA to describe sort of coming back to Congress to modify an existing project. And so it was expanded to include those sorts of reports that would suggest or identify alternatives for modifying an existing project. That's not what the Corps has done here. The Corps has not prepared a report to Congress to modify the water resources development project. It is, in fact, continuing construction with the project as it was authorized by Congress. As part of this dialogue, I assume appropriations are a big part of that. Yes. Okay. The briefs don't talk about that process much at all. But I assume that Congress is having to appropriate year by year or at least specific site by site. Do this, do that. This legislation is very, very specific. Yes, Your Honor. And so the Corps' process is typically with Congress. It will authorize projects separately from the appropriations. So, Congress has appropriated funding for specific sites along the middle Mississippi. And the Corps has used that construction funding in various ways to both build these new structures, prevent channel cutoffs, and going forward has implemented the mitigation measures. All of that occurs, though, pursuant to the existing project. Yes, Your Honor. There's no alteration of the underlying project. It's just a continuation in light of current needs and circumstances. Correct, Your Honor. And I would point out again in the 2014 WERDA, Congress referred to it as the Project for Navigation. As we detail in our brief, after the 1976 EIS was prepared, the Corps had a proposal to change the authorization of the project. That was not something Congress has adopted. And so here we have a clear directive from Congress in both those early 1910 and 1927 acts. But we also have a subsequent history where the Corps has been in dialogue with Congress, where Congress has funded specific projects. Congress has repeated... Counsel, can we transition a little bit to the National Environmental Policy Act? We will have another opportunity to address that. Can we talk through why you believe that the purpose statement is sufficient? Sure, Your Honor. So, again, this project was authorized in the 1910 Rivers and Harbors Act, which stated that the Corps shall obtain a channel that was 300 feet wide, 8 feet deep, using river training structures, reducing dredging. That project was modified in the 1927 Rivers and Harbors Act, which stated that the project was modified in accordance with the recommendations submitted by the chief of engineers in letter to the chairman of the committee. Plaintiffs do not argue that the Corps shouldn't be looking to this authorization. Instead, they rest their argument entirely on a misinterpretation of what that authorizing legislation said. So the chief's letter is the first couple pages in the document that we included in our supplemental appendix. That is the operative document that the Congress was focused on. They specifically said the letter from the chief. In other parts of the same act, they said the document submitted. And the chief's recommendations specifically say that the Corps should obtain a channel that's 300 feet wide and 9 feet deep. Again, using river training structures, reducing the use of dredging because it provides only temporary results on this section of the river. That's exactly what guided the Corps' purpose and need statement here, and it was very reasonable. Plaintiffs don't disagree that it was reasonable to look at that. I'm going to transition just to the reasonable alternatives. The argument is that the scoping that, in particular, the Corps has been some summarily dismissive of the scoping idea because they would have to go back to Congress to request additional funding. If I may answer. So, so the Corps, you know, looked at had this clear directive from Congress at a supplemental EIS. As we detail in a brief, it went through various alternatives. It incorporated some of the things that plaintiffs said, and it specifically explained why it thought certain alternatives were not reasonable. So, for example, the alternative that would seek a purpose change. For one, the continuing construction alternative does incorporate measures to protect habitat, while also ensuring that the Corps maintains a reliable channel. Plaintiffs don't explain how the Corps could prioritize environmental impacts and maintain the channel in a different way than the Corps is saying it will do. Courts have also said that the agencies need only consider an alternative that requires congressional action in very rare circumstances. And here, where we have a clear directive from Congress about what the purpose of the project is, reaffirming as recently as 2014 that it's for navigation. It was not unreasonable for the Corps to look at what Congress has said and and find and consider it that unlikely and speculative that Congress would would amend the purpose of this project to prioritize environmental protection. Thank you, Your Honors. Okay, thanks to you, Miss Collier. Mr. First, I wanted to elaborate on the subsection H issue. If one examines H, one finds under subsection 2, use of mitigation plans, the secretary shall, to the maximum extent practicable, use programmatic mitigation plans developed in accordance with this subsection to guide the development of a mitigation plan under subsection D. That makes clear that H is not intended to be a substitute for or to displace the requirement, the mandatory requirement for a mediation plan under D. Furthermore, H is discretionary, so it cannot begin to replace a mandatory duty under D. With regard to NEPA, we had a couple comments, as we explained in the briefs. Where an agency receives requests from the public to address reasonable alternatives that would reduce environmental impacts, the agency is obliged to examine them, to study, develop, and describe them in the classic words of NEPA and may not evade that duty. There are a number of cases, for example, the Southeast Conservation case out of the Ninth Circuit that we cite that specifically say it's improper for an agency to consider an alternative only in a response to comments and only for the purpose of explaining why it rejects it. The agency has an independent duty to study, develop, and describe the alternative, hearkening back to the Bob Marshall Alliance cases 30 years ago. So, here that didn't happen. And as a consequence, alternatives that the public in good faith had presented in the hopes that they would receive the expert analysis from the Corps' own engineers as to the feasibility of those alternatives, that's the point of NEPA, is a win-win. Those hopes were dashed, and we're here before the court to request that the agency be directed to provide in good faith the discharge of its duty to study, develop, and describe those alternatives. Okay, Mr. Volker, thank you very much.